**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROMEO BLACKMAN, TERRANCE SMITH, and JOLICIOUS TURMAN,<br><br>Defendants. | Case No. 18-CR-00728<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

Defendants moved pursuant to Federal Rule of Criminal Procedure 29(c) for judgements of acquittal and Rule 33 for a New Trial in the alternative. [564], [565], [566]. As noted on the record previously [602], and for the reasons stated below, this Court denied Defendants' Motions for Acquittal or, in the alternative, Motion for New Trial; and after granting the request for an evidentiary hearing [670], this Court also denied Defendant Blackman's second motion for a new trial, [647] (joined by Defendant Smith, [650]) on April 30, 2026 [694], and denied Defendant Smith's own renewed motion [668].

## I. Background

In this case, the Government charged Defendants Romeo Blackman, Terrance Smith, Jolicious Turman, and Nathaniel McElroy, with racketeering conspiracy in violation of 18 U.S.C. § 1962(d), and eleven other related counts in violation of 18 U.S.C. §§ 1959 and 924(c). [56]. The Government alleged the Defendants were members of the Goonie Boss/Goonie Gang street gang. On the first day of trial, May 16, 2023, prior to the start of proceedings, Defendant McElory entered a guilty plea. [448]. The remaining defendants moved forward with trial the same day. [451].

### A. Indictment[1]

In the superseding indictment [56], Count One charged the Defendants with engaging in a racketeering conspiracy involving a variety of predicate act objectives through an enterprise known as the Goonie/Goonie Boss gang, in violation of Title 18 U.S.C. § 1962(d).

The remaining counts charged various violent acts in aid of racketeering. Counts Two and Three charged Blackman and Smith with the murders of Stanley Bobo and Krystal Jackson in violation of 18 U.S.C. § 1959(a)(1) and 2. Counts Nine and Ten charged Blackman with the murders of Andre Donner and Davon Horace in violation of 18 U.S.C. § 1959(a)(1). Count Eleven charged Turman with the murder of Ramal Hicks in violation of 18 U.S.C. § 1959(a)(1). Counts Four, Five, and Six charged Blackman and Smith with attempted murder in violation of 18 U.S.C. § 1959(a)(5) and 2. Counts Seven and Eight charged Smith with assault with a dangerous weapon and assault resulting in serious bodily injury and assault with a dangerous weapon in violation of 18 U.S.C. § 1959(a)(5) and 2; and 18 U.S.C. § 924(c)(1)(A) respectively.

The table below summarizes these charges.

| Count | Defendants | Violations | Description |
|---|---|---|---|
| 1 | Blackman, Smith, Turman, McElroy | 18 U.S.C. § 1962(c) and (d) | RICO Conspiracy |
| 2 | Blackman Smith | 18 U.S.C. § 1959(a)(1) and 2 | Murder of Stanley Bobo |
| 3 | Blackman Smith | 18 U.S.C. § 1959(a)(1) and 2 | Murder of Krystal Jackson |
| 4 | Blackman Smith | 18 U.S.C. § 1959(a)(5) and 2 | Attempted murder of Victim 1 |
| 5 | Blackman Smith | 18 U.S.C. § 1959(a)(5) and 2 | Attempted murder of Victim 2 |
| 6 | Blackman Smith | 18 U.S.C. § 1959(a)(5) and 2 | Attempted murder of Victim 3 |
| 7 | Smith | 18 U.S.C. § 1959(a)(3) | Assault with a dangerous weapon and assault resulting |

[1] On February 13, 2023, the Court granted Defendant Blackman's motion to sever Count Two of the indictment. *See* [303]. Counts Three through Twelve of the superseding indictment were subsequently renumbered as Counts Two through Eleven for the purposes of trial. The Court uses that trial numbering here.

| | | | |
|---|---|---|---|
| | | | in serious bodily injury against Victim 4 |
| 8 | Smith | 18 U.S.C. § 924(c)(1)(A) | Assault with a dangerous weapon in aid of racketeering activity |
| 9 | Blackman | 18 U.S.C. § 1959(a)(1) | Murder of Andre Donner |
| 10 | Blackman | 18 U.S.C. § 1959(a)(1) | Murder of Davon Horace |
| 11 | Turman | 18 U.S.C. § 1959(a)(1) | Murder of Ramal Hicks |

### B. Trial

Spanning several weeks at trial, the Government's case included dozens of lay and expert witnesses, videos, social media posts, photographs, recordings, crime scene evidence, and other physical evidence. The evidence showed that the "Goonie" RICO enterprise (made up of the "Goonie Boss" and "Goonie Gang" street gangs and associates) functioned to seek out and kill "ops" (rival gang members) through shootings and other activities, including acquiring and distributing firearms for those shootings. The Government's evidence highlighted several murders, attempted murders, and other Goonie activities. The Government rested its case on June 13, 2023. After the Government rested, the Defendants made oral Rule 29(a) motions for a judgment of acquittal. Tr. 2765–66. The Court heard arguments from the parties and orally denied the motions. Tr. 2766–69.

In his defense case, Defendant Blackman called one witness and put several stipulations into evidence. Defendant Smith provided no additional evidence, and Defendant Turman proceeded by entering some stipulations and offered the testimony of one witness. No Defendant chose to testify. The Defendants all rested their cases on June 14, 2023, and renewed their Rule 29 motions at the close of all evidence. Tr. 2854.

The jury returned verdicts in two stages. First, in "Phase One," the jury determined the Defendants' criminal liability for the charged counts, including determining whether the Government proved that the Defendants committed specific murders as part of the charged racketeering activity. After the first stage, the jury received "Phase Two" instructions and returned special verdicts regarding the specific characteristics of the RICO predicate activity, consistent with *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

On July 5, 2023, the jury returned their verdict as to Phase One. [521].[2] The jury found Defendant Blackman guilty on Counts One through Six, and on Count

[2] Before the jury returned its Phase One verdict, the jury sent a note that it could not reach a unanimous verdict on all counts/special findings. Tr. 3466. Over objection of Defendant Blackman, the Court properly gave the jury the traditional *Silvern* instruction. Tr. 3473–74. In the Court's discussion on the record with the parties regarding the *Silvern* instruction, counsel for Defendant

Nine. The jury found Blackman not guilty on Count Ten. The jury made additional findings under Count One regarding Defendant Blackman, namely, that the murders of Stanley Bobo, Krystal Jackson, Andre Donner, Davon Horace, and Gerald Sias were "Proven," and that the murder of Johnathan Johnson was "Not Proven." [524].

For Defendant Smith, the jury found him guilty on Counts One through Six. The jury found Defendant Smith not guilty on Count Seven and Count Eight. The jury made additional findings under Count One regarding Defendant Smith, namely, that the murders of Stanley Bobo and Krystal Jackson were "Proven," that the attempted murders of Erin Ross and Thomas Turnage were "Proven," and that the attempted murder of Quincent Hayes was "Not Proven." [525].

As to Defendant Turman, the jury returned a verdict of guilty on Count One, and acquitted Turman of Count Eleven. The jury made additional findings under Count One regarding Turman, namely, that the murder of Kenneth Whittaker was "Proven" and that the murder of Ramal Hicks was "Not Proven." [522].

On July 6, 2023, the jury made the following findings in Phase Two of the verdict. [526]. For Defendant Blackman, the jury found: (1) it was "Proven" that the Stanley Bobo murder was cold and calculated; (2) it was "Not Proven" that the Krystal Jackson murder was cold and calculated; (3) it was "Not Proven" that the Andre Donnor murder was cold and calculated; (4) it was "Not Proven" that Blackman personally discharged a firearm in connection with the Andre Donner murder; (5) it was "Not Proven" that the Davon Horace murder was cold and calculated; (6) it was "Not Proven" that Blackman personally discharged a firearm in connection with the Davon Horace murder; (7) it was "Proven" that the Gerald Sias murder was cold and calculated; and (8) it was "Proven" that multiple murders were committed by Blackman. [530].

For Defendant Smith, the jury found: (1) it was "Proven" that the Stanley Bobo murder was cold and calculated; (2) it was "Proven" that Smith intentionally discharged a firearm from a motor vehicle and Stanley Bobo was not present within the vehicle; (3) it was "Not Proven" that the Krystal Jackson murder was cold and calculated; (4) it was "Not Proven" that Smith personally discharged a firearm in connection with the Krystal Jackson murder; (5) it was "Not Proven" that Smith personally discharged a firearm in connection with the Erin Ross attempted murder; (6) it was "Not Proven" that Smith personally discharged a firearm in connection with the Thomas Turnage attempted murder; and (7) it was "Not Proven" that multiple murders were committed by Smith. [528].

---

Smith appeared to suggest that the Court might have previously yelled at the jury. Tr. 3470. The Court reiterates here, as it did on the record, Tr. 3470, that mischaracterization of the record is completely false and, to the degree counsel was making such a suggestion, the claim would be unethical; the Court never raised its voice at the jury during the course of trial, nor did it ever speak in an inappropriate tone to the jury.

For Defendant Turman, the jury found it was "Not Proven" that the Kenneth Whittaker murder was cold and calculated. [529].

Each Defendant filed separate post-trial motions, seeking judgments of acquittal on various counts and a new trial on other grounds of claimed error. [564]; [565]; [566]. On June 5, 2024, the Court heard arguments on the motions and orally denied Defendants' motions, noting on the record that the Court would provide additional findings of fact and conclusions of law by a separate written order. [603].

On July 10, 2025, Defendant Blackman filed a second motion for a new trial and requested an evidentiary hearing on the grounds that one of the Government's witnesses provided new information to counsel that his testimony at trial was false. [647]. Defendant Smith later adopted this motion. [675]. The Court held an evidentiary hearing on April 30, 2026 and orally denied the motion with findings of fact, again noting on the record that the Court would issue an additional written ruling by separate order. [694].

The Court now provides further factual findings and conclusions of law below.

## II. Motions for Acquittal

### A. Rule 29 Standard

When considering a motion for a judgment of acquittal, the trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29; *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). A motion for judgment of acquittal requires the Court to distinguish between reasonable and speculative inferences. *United States v. Jones*, 713 F.3d 336, 346–47 (7th Cir. 2013). The "reasonable inferences" a jury makes in "each step in the inferential chain must be supported by evidence" and cannot rely on mere speculation or suspicions. *Jones*, 713 F.3d at 340 (citing *Coleman v. Johnson*, 566 U.S. 650, 654–55 (2012)). Each juror must also use his or her common sense in weighing the evidence. *United States v. Guzzino*, 810 F.2d 687, 697 (7th Cir. 1987). Ultimately, the trial court must afford "great deference" to the jury's verdict, view the evidence in the light most favorable to the conviction, and ask "whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Garcia*, 919 F.3d 489, 497 (7th Cir. 2019) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). Given this standard, a defendant "faces a 'nearly insurmountable hurdle'" in making a motion for acquittal. *Id.* (quoting *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017)); *United States v. Xiao*, 77 F.4th 466, 470 (7th Cir. 2023).

### B. RICO Conspiracy

Defendants challenge their convictions under § 1962(d) on multiple grounds. First, all Defendants challenge the sufficiency of evidence for a RICO conspiracy conviction generally. All Defendants also dispute the underlying constitutionality of the RICO statute itself and the Court's response to Jury Note 6. Further, Defendants Smith and Turman argue that the Government failed to prove their participation in the Goonie Enterprise. The Court will address each of these issues.

#### 1. Sufficiency of Evidence

To sustain a conviction of RICO conspiracy, the Government must prove three elements beyond a reasonable doubt: (1) that the charged "Goonie Boss/Goonie Gang" street gang was an enterprise; (2) that the defendant knowingly conspired to conduct or participate in the conduct of the affairs of the "Goonie Boss/Goonie Gang" street gang, an enterprise, through a pattern of racketeering activity; and (3) that the activities of the "Goonie Boss/Goonie Gang" street gang would affect interstate commerce. *See* [531] at 31; *see also United States v. Olson*, 450 F.3d 655, 664 (7th Cir. 2006).

Defendants challenge all three elements, arguing that (1) the evidence did not establish the existence of a RICO enterprise; (2) the Goonies did not have a structure or operate independently of their alleged racketeering activity; and (3) the Goonies' activity did not affect interstate commerce. Defendants Smith and Turman further argue the Government failed to prove their participation in the Goonie Enterprise, and Defendant Turman argues that his RICO conspiracy conviction did not properly rest upon two "predicate act" objectives of the racketeering conspiracy.

##### a. Enterprise

The statutory definition of a RICO enterprise includes "any group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court elaborates that an "association-in-fact" enterprise operates as a "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944–45 (2009). The existence of such an enterprise can be proved by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.* at 945. Further, an enterprise need not have any structural features, such as hierarchy, beyond "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

Contrary to Defendant's arguments, the Government presented overwhelming evidence of the enterprise, including credible witness testimony, social media

evidence, and recorded statements, to establish that the "Goonie Boss/Goonie Gang" street gang constituted an association-in-fact enterprise and that the Defendants participated in the RICO enterprise as charged. For example, testimony from former Goonie Boss and Goonie Gang members provided significant information about the operation of the Goonie Enterprise. Among other things, the Goonie Enterprise consisted of Goonie Boss and Goonie Gang. Tr. 315, 525, 1256, 2045–46, 2441–42. In Goonie Boss, everyone acted as a boss, and later, in Goonie Gang, younger members all answered to the gang leader Defendant Blackman. Tr. 504–05, 510, 1248, 1252–53, 1255–56, 2045–46. Alex Vaughn, a former member of Goonie Boss and Goonie Gang, also provided significant details about the Goonie Enterprise's ongoing organization, activities, and the Defendants' roles within it. Vaughn described the creation of the Goonies and Goonie Boss street gangs along with the groups' activities—swimming, basketball, drug dealing, shooting rival gangs, and using the money from drug sales to buy more guns to protect territory and kill rivals. Tr. 504–05, 509–10, 512–14. In his testimony, Vaughn specifically identified Blackman, Smith, and Turman as Goonie Boss members. Tr. 510–12. Vaughn added that all Defendants "put in work," meaning they shot someone, killed someone, or otherwise made a name for themselves by participating in the violent activities of the gang enterprise. Tr. 517–19.

Likewise, Alvin Vaughn, another member of Goonie Boss and Goonie Gang, described the founding of Goonie Boss, Tr. 1248, and the evolving structure and activities of Goonie Boss, Tr. 1252–53. Vaughn testified about Goonie Boss' acquisition of guns, Tr. 1253–54, and about the gang's regular activities and methods of operation, including gang meetings, stash houses, drugs sales, robberies, and shooting missions against police officers, rival gangs, and others. Tr. 1266–67, 1270–73. Vaughn also testified that, around 2015, he sold drugs with Defendant Blackman and then the money was used to buy guns for the Goonies. Tr. 1269–70. Vaughn identified Defendant Blackman as part of Goonie Boss/Goonie Gang and as a leader of the Goonie Gang. Tr. 1256–57.

Additionally, Quincent Hayes, a former Goonie gang member, provided more details about the organization of the Goonie Enterprise. Hayes described the territory of the Goonie gang, the various roles held by members of the Goonie Enterprise such as shooters, car thieves, and marijuana drug dealers, Tr. 316–17, and the regular Goonie meetings which were held once or twice a week to discuss rival gangs and other gang business. Tr. 317, 321. Hayes further identified both Defendants Blackman and Smith as members and shooters in the Goonie Gang. Tr. 322–24.

Another former Goonie Boss and Goonie Gang member, Raymond Parks, testified about gang initiations wherein an individual would be "jumped in" to join Goonie Boss, that is, they would be hit by other members for 60 seconds without putting up any defense. Tr. 2040–41. He also testified about other methods and the

fact that he was "blessed" into Goonie Boss (not jumped in), because he knew Alex Vaughn, who introduced him to the other members, and thus, he joined Goonie Boss through those introductions. Tr. 2035, 2039. When Parks joined, Alex and Alvin Vaughn both acted as leaders of Goonie Boss. Tr. 2044–45. Parks also testified that Defendant Blackman was a member of Goonie Boss, who later became the leader of Goonie Gang after Alvin Vaugh's death, and that he supplied the group with guns. Tr. 2045–46, 2048–49, 2321. Parks further described Blackman's role in Goonie Gang as including enforcer responsibilities and that he was a person who "did more violent stuff than most of us" in the gang, including gang murders. Tr. 2049. Parks also detailed other roles individuals performed in the Goonie Gang, and that the enterprise included drug sellers like himself and enforcers, people who apply pressure on rivals through physical harm, like Defendant Blackman. Tr. 2050–51. Within the Goonie Enterprise, "shorties" took orders from older members of Goonie, and, when law enforcement arrived, the shorties would "take cases" for older members including taking responsibility for guns possessed by an older Goonie member, because the shorties had a better chance of getting out of jail when charged with a weapons offense. Tr. 2322–23. Parks identified Defendant Smith as a member of Goonie Gang and close to Defendant Blackman, Tr. 2051–52, and he also identified Defendant Turman as a Goonie Gang member. Tr. 2053–54.

Delbert Van Allen, Defendant Blackman's cousin and a former member of Goonie Gang/Goonie Boss, Tr. 2515, 2518, also identified Defendants Smith and Turman as members of the Goonie Enterprise. Tr. 2519.[3]

Such enterprise evidence remains more than sufficient. As the Supreme Court explained in *Boyle*, an enterprise simply requires purpose, relationships, and longevity. *Boyle*, 556 U.S. at 946. The Government's evidence clearly established the common purposes of the Goonie Enterprise—including its goals of shooting and trying to kill cops and opposition gang members to become the toughest street gang in Chicago. Tr. 317–18, 406–07, 516, 1270–71, 2090–91. The Goonie Enterprise accomplished this common course of conduct through, among other things, shootings, acquisition of firearms, and drug sales to raise money for guns. Tr. 1276–78, 1309–10, 1467. Indeed, the Government produced overwhelming evidence establishing the purpose and means that the RICO enterprise employed to achieve its aims, including: (1) the murder of Stanley Bobo on an opposition gang block while Goonies were driving around looking for opposition gang members; (2) the murder of Krystal

[3] Corroborating all of this credible insider testimony, various civilian witnesses with personal knowledge also identified the Defendants as members of the Goonie Enterprise. For instance, Timesha Simmons testified that Defendant Blackman and his friends called themselves Goonie, and she identified Defendant Smith as Blackman's gang associate. Tr. 125–29. Likewise, Anna Lee identified Defendant Blackman as part of the Goonie Gang and Defendant Smith as a gang associate of Blackman. Tr. 911–13. Adam Johnson and David Hayes also identified Defendant Blackman as a member of Goonie. Tr. 1563, 2736–37. Raven Owens additionally identified both Defendants Blackman and Smith as members of Goonie. Tr. 1593–95.

Jackson while seated in a car with opposition gang members; (3) the murder of Andre Donner on an opposition gang block; (4) the murder of Davon Horace on an opposition gang block; (5) the murder of Gerald Sias in an attempt to murder a rival gang member who reportedly killed a Goonie member; and (6) the murder of Kenneth Whittaker while driving around opposition blocks seeking retaliation for the death of a Goonie member.[4]

Through such witnesses and evidence, the Government proved the common purpose, roles, and structure of the charged RICO enterprise, as well as the predicate act objectives of the RICO conspiracy. The Goonie Enterprise included both the Goonie Boss and Goonie Gang street gangs, and members would often use the generic reference "Goonie" to describe the group and its associates. Within this RICO enterprise, members played different roles over time. Tr. 316, 409, 513, 1266, 2050. For example, Hayes acted as a shooter and car thief, Tr. 316; Alex Vaughn acted a shooter, Tr. 326; Alvin Vaughn acted a shooter and drug dealer, Tr. 411, 738, 740, 1266–67; Blackman acted as a drug dealer, a shooter, and a leader of the Goonie Gang, Tr. 322–23, 519, 737, 1269, 2049; Smith acted as a shooter, Tr. 2050, 2081; Reed acted as a shooter, Tr. 327; and Turman acted as a shooter, Tr. 519.

Several witnesses also described the common methods employed during gang shootings. For example, if on foot Goonies would employ "hit cuts" or "trail each other" strategies, if Goonies entered rival territory by car, they traveled with two decoy cars and a shooter car in the middle, Tr. 2091–92, 2446, and shooters would remove gunpowder residue by bleaching or urinating on their hands. Tr. 351, 1310, 1323. The Goonie Enterprise also patrolled and controlled territory in Englewood, Illinois. Tr. 316, 516, 2087–89, 2319–21. Former members of Goonie explained that members paid gang dues to the RICO enterprise (as corroborated by Defendant Turman's own Facebook message about putting money into the common pot). Gov't Ex. 2252-09. According to gang insiders, the Goonie Enterprise also expected loyalty and enforced its own rules—if a member got caught "snitching," the penalty was death. Tr. 454, 1354–55. Additionally, the Government presented other traditional street gang evidence establishing the RICO enterprise.[5] Finally, the Government's evidence regarding the Goonie Enterprise spanned from 2014 through June 2018, showing more than sufficient longevity.

---

[4] The Government also presented various recorded statements supporting its case, including evidence of jail call recordings after the death of a Goonie gang member in which Defendant Blackman ordered retaliation shootings so that the Goonie group could become strong again. Gov't Ex. 2273-1, 2273-T.

[5] At trial, the Government proved that members of the Goonie Enterprise identified themselves with clothing signifying their Goonie membership, Gov't Ex. 2277; 2282; 2284; 2287; 2288; 2290; 2291; 2292; Facebook names that included Goonie, *e.g.*, Gov't Ex. 2249; Goonie handshakes and gang signs, Tr. at 1353–54, 2094–95, 2450; and Facebook videos where members yelled and called-out "Goonie" chants. Gov't Ex. 2275, 2320.

Based upon the entire trial record, the Government's evidence easily formed a sufficient basis for the jury to conclude that the Goonies constituted a RICO enterprise. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010) ("The alleged enterprise in this case had purpose and relationships and it certainly had 'longevity,' and if *Boyle* is taken at face value, nothing more is required to make a conspiracy a RICO enterprise."); *United States v. Morales*, 2009 WL 1456567, at *4 (N.D. Ill. May 22, 2009) (holding that the Insane Deuces street gang was a criminal racketeering enterprise since it functioned as a continuing unit with a chain of command; had distinct roles for gang members; members engaged in drug trafficking to benefit the gang; and members had access to a common fund of money, drugs, and guns).

**b. Independent Structure**

Defendants argue that the Goonie Enterprise cannot be considered a RICO enterprise because Goonie had supposedly no purpose or structure beyond its pattern of racketeering activity. Not so.

In *Turkette*, the Supreme Court distinguished the separate elements of "pattern of racketeering activity" and "enterprise": "the enterprise is an entity," as defined above, while "the pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The enterprise itself "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit," whereas a pattern of racketeering activity "is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise." *Id.* These two concepts naturally relate; "enterprise" does not prove a "pattern of racketeering activity," but the evidence supporting each may relate, if not overlap. *See id.* at 583; *Boyle*, 556 U.S. at 947 (". . . evidence used to prove the pattern of racketeering and the evidence establishing an enterprise may in particular cases coalesce."). Accordingly, the use of converging evidence in this case to prove both the existence of the RICO enterprise and the alleged pattern of racketeering activity (or, as in this case, not predicate acts, but rather the racketeering predicate objectives of the RICO conspiracy) remains entirely proper.[6]

With this principle in mind, and as the Court already explained, the Government presented overwhelming evidence to prove the required elements of an enterprise in this case; and furthermore, the trial evidence of the RICO enterprise here also transcended the mere performance of predicate acts, and included gang signs, rules, dues, and rituals, among other things.

[6] For the reasons the Court explains below, the same principle applies to the "pattern of racketeering" objectives as charged, and no "separate" evidence, beyond what the elements of RICO expressly require, is needed.

### c. Interstate Commerce

Defendants further argue that, since the Goonie Enterprise lacked an apparent economic motive, the gang's activities could not affect interstate commerce, because, as Defendants note, 18 U.S.C. § 1962 limits its applicability to "any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." But contrary to Defendants' assertions, RICO requires no economic motive at all, much less an economic motive tied to commerce; and instead, the Government only need show proof "that the activities of" the enterprise" would have a "de minimis" effect on interstate commerce. *United States v. Maloney*, 71 F.3d 645, 662–64 (7th Cir. 1995); *United States v. Espinoza*, 52 Fed. App'x 846, 848–49 (7th Cir. 2002); *Nt'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256–62 (1994); 18 U.S.C. § 1962(c); *See* Pattern Criminal Jury Instructions of the Seventh Circuit 849 (2025).

In this case, the Government proved the requisite elements of the charged offense. At trial, the Government proved that the Goonie Enterprise engaged in activities that affected interstate commerce in several ways, including: (1) trafficking in firearms from the State of Michigan; and (2) committing the burglary of a gun store (engaged in interstate commerce) located in Streator, Illinois.[7] For example, the Government proved that a Goonie member (Nathaniel McElroy)[8] bought and supplied the Goonies Enterprise with firearms transported in interstate commerce. Tr. 648, 2321. In fact, the Government played audio recordings in which McElroy told Alex Vaughn that he got firearms from a store "in Michigan" for the Goonies. Tr. 648–52, Gov't Ex. 2111, 2111-T, Gov't Ex. 2106, 2106-T. In the recorded phone call, McElroy told Vaughn how he purchased firearms from the store in Michigan, the price per firearm, and the cash payment. Tr. 650–51; Gov't Ex. 2111; 2111-T. McElroy further gave Vaughn the names of two people Vaughn needed to see to acquire more out-of-state guns, Chop and Rico. Tr. 651–652; Gov't Ex. 2111, 2111-T. Subsequently, under the direction of the FBI, Vaughn followed McElroy's instructions and went to Kalamazoo, Michigan and purchased firearms. Tr. 650–52. The purchase followed the same process as McElroy had described in the calls. In Michigan, Rico took Vaughn to a gun store, Vaughn gave Rico money, Rico had someone go into the store and buy the guns, Vaughn gave Rico $150 for each gun, and Rico gave Vaughn the guns. Tr. 651–52. Chop also sold guns to Vaughn. Tr. 652.

---

[7] Obviously, the Government does not need to show that each Defendant personally engaged in the activities that affected interstate commerce; Once the Government proves that a defendant is a conspirator in violation of 1962(d), such defendant may be held liable for the activities of the RICO enterprise he joined. *Salinas*, 522 U.S. at 63–64 (1997).

[8] Among other evidence, several witnesses identified McElroy as part of Goonie, Tr. 126, 129, 648, 1261–63, 1647–48, 1654, 2076–77; and Parks testified that McElroy participated in a Goonie Facebook chat with the name "Goonie McElroy", Tr. 2192–93. The Government also produced a social media video that showed McElroy making a Goonie Boss sign with his hands. Gov't Ex. 2320, Tr. 2225.

In short, the trial evidence was more than enough to meet the Government's burden.[9] The evidence showed that the procurement of firearms was essential to the Goonie Enterprise and its common purposes, as they sought to target and shoot rival gang members. Alex Vaughn and Parks testified that McElroy shared the firearms from Michigan with other Goonie members, Tr. 648, 2321, and thus, McElory's actions as part of the Goonie Enterprise had the requisite *de minimis* effect on interstate commerce.

The Government additionally presented evidence of a gun store burglary committed by Goonie members to acquire more firearms for the gang. George Parsons, an employee at LZ Resale & Indoor Shooting Range in Spring Valley, testified that someone stole his Jeep from the LZ Resale parking lot, and it was later found at South Post. Tr. 1948–1951. Sarah McClure, who was living in Streator, Illinois with Jordan Scott Bennett and Goonie member Rashad Anchando (Bamboo), testified that several Goonie members, including Bamboo, Defendant Blackman, Goldie, and Punchie, were in her home during the day of June 21, 2016. Tr. 1660–61, 1669, 1682–83. That night, Punchie, Defendant Blackman, Goldie, Bamboo, and two others changed into black clothing, including dark hooded sweatshirts, and left the house. Tr. 1671–72. Brian Pfibsen, the owner of South Post LLC, testified that early in the morning on June 22, 2016, he received a notification of an alarm at the gun store. Tr. 1699. The store's surveillance cameras showed the same stolen Jeep driving through the front of South Post, individuals breaking glass, and those same individuals stealing guns and fleeing on foot. Gov't Ex. 1917; 1917-1; 1918; 1918-1; 1919; 1919-1; 1920; 1920-1; 1921; Tr. 1699–1705. Shortly after the burglary, McClure testified that the same individuals who had left her home in black clothing (consistent with the video-footage) returned separately with bags that contained firearms from the burglary. Tr. 1672, 1687–88. When McClure and Jordan cleaned the house the following morning, they found tags from the same gun store with the prices still on them. Tr. at 1673, 1689. The Goonies also posted on social media videos of themselves with these same guns. Gov't Ex. 1943, 1944; Tr. 1666–68, 1685, 1711–17, 2290, 2292–93. In one of the videos, three individuals, including Bamboo, hold firearms with gun store tags still attached. Gov't Ex. 1943, Tr. 1666–68, 1685. Brent

[9] Other Government witnesses also described McElroy's recurring transport of guns from Michigan to Illinois for the gang. Cornelius Battle testified that he participated in a straw purchasing scheme that allowed McElory to bring firearms from Michigan to Chicago. Tr. 2258–70. Battle twice purchased firearms for other members and identified McElroy as one of the people who drove him to the gun store in Michigan. Gov't Ex. 2112 at 4; Tr. 2267–70. Janel Rhodes, McElroy's ex-girlfriend, testified that she twice traveled to Kalamazoo, Michigan with McElroy. The first time, a man Rhodes did not know purchased a firearm from a sporting goods store and left the gun in the back of Rhodes and McElroy's car. Tr. 2504–07. They then brought the firearm back to Illinois. Tr. 2507. The second time Rhodes and McElroy traveled to Kalamazoo, Michigan, a woman went with them to a pawn shop store, purchased a firearm, and left the firearm in their car. Tr. 2507–09. Rhodes and McElroy then went to a different store with a different woman, who again purchased a firearm from the shop and placed the firearm in Rhodes and McElroy's car. Tr. 2510–12. After these straw purchases, Rhodes and McElroy then returned to Illinois with the firearms for the gang. Tr. 2512.

Turpin identified Trevante Reed (Tooka), a Goonie member, as one of the individuals in the video. Tr. 2290, 2293.

Pflibsen also testified about his gun store's role in interstate commerce. The store sold firearms and related ammunition from distributors from Indiana and Louisiana, which the distributors sent via mail from interstate carriers such as UPS or FedEx after the store placed its orders by telephone or online. Tr. 1697–98. After the burglary, Pflibsen could not operate his interstate business. Tr. 1710–11. Pflibsen closed the store for several months to complete repairs from the break in, which caused damages estimated at $140,000. Tr. 1710. Obviously, this gun store burglary, an activity committed within the Goonie Enterprise's affairs, caused the requisite *de minimis* effect on interstate commerce.[10]

Lastly, the Government also presented social media evidence posted by the Goonie Enterprise wherein members bragged on Facebook about their activities and made threats as part of their racketeering activities. Stipulation 1, in turn, stated that "Facebook's servers were located outside the state of Illinois between 2014 and 2018" and thus, any data for these posts must have traveled across Illinois state lines. Stipulation 1; Tr. 78–81.

Each of these described gang activities—the transport of firearms from Michigan, the South Post gun store burglary, drug sales of cocaine, crack and heroin, and gang-related social media posts via interstate servers—show, at very least, a *de minimis* effect which the Goonie Enterprise's activities had on interstate commerce. Therefore, the jury had more than sufficient evidence to properly find that the activities of the Goonie Enterprise would have affected interstate commerce for the purpose of Count One.

#### d. Defendant Smith

Defendant Smith argues that the Government failed to prove both his participation in the Goonie Enterprise and that he conspired to commit two predicate acts. Under 18 U.S.C. § 1962(d), however, the Government only need prove that that the defendant conspired "to violate any of the provisions of subsection (a), (b), or (c)" of § 1962. In other words, it is enough that Defendant Smith joined a conspiracy where the object of the conspiracy involved an agreement that two RICO predicate acts would be committed by some member of the conspiracy.

[10] In addition to gun trafficking and the gun store burglary, the Government showed that the Goonie Enterprise sold cocaine, crack, and heroin. Tr. 1267; 1269; 1459. Distribution of controlled substances is within the class of activities that have a substantial effect on interstate commerce; one who affects intrastate sales of drugs affects commerce over which the United States has jurisdiction. *Taylor v. United States*, 579 U.S. 301, 306–07 (2016). Additionally, as noted at trial, since these drugs are not manufactured in the State of Illinois, the drugs the Goonies sold also traveled in interstate commerce.

As described above, several witnesses identified Defendant Smith as part of Goonie Boss/Goonie Gang. Quincent Hayes identified Smith as a shooter for the Goonie Gang, Tr. 322–24, Alex Vaughn identified Smith as a Goonie Boss member, Tr. 510–12, and as someone who "put in the work," meaning that Smith shot or killed someone, or otherwise made a name for himself, within the affairs of the enterprise, through gang violence. Tr. 517–19. Alvin Vaughn also identified Defendant Smith as a member of Goonie Boss/Goonie Gang. Tr. 1259–61. Raymond Parks, Delbert Van Allen, and Raven Owens also identified Smith as part of Goonie. Tr. 1593–95, 2051–52, 2519.

The Government's evidence further showed that Defendant Smith was not only associated with the Goonie Enterprise but also participated in its predicate activities through taking part in shootings, and in other enterprise activities. Since the jury found Smith guilty of the RICO conspiracy, and the Court finds the evidence sufficient to support the 1962(d) charge in this case, the Government did not need to prove that Smith committed or agreed to commit any specific predicate acts at all. *See Salinas v. United States*, 522 U.S. 52, 63 (1997) ("The jury acquitted on the substantive count. Salinas was convicted of conspiracy, however, and he challenges the conviction because the jury was not instructed that he must have committed or agreed to commit two predicate acts himself. His interpretation of the conspiracy statute is wrong.").[11]

Because the Government presented sufficient evidence for a reasonable jury to convict Smith on the RICO conspiracy count, this Court will not overturn the verdict as to Count One.

---

[11] Nevertheless, Smith claims that he was not involved with the Goonie Gang after 2015 and thus argues that he cannot be held responsible for activities occurring after 2015, including those that affected interstate commerce. At the post-trial motion hearing on June 5, 2024, however, Smith admitted (as he must, given the factual record) that he did not legally withdraw from the conspiracy in 2015. Tr. 9. Considering this admission, and the trial record, Smith's argument here instead focuses on asserting that the RICO enterprise never existed. Tr. 9–10. This theory is unavailing. As the Court has already explained, the Government provided sufficient evidence of the Goonie Enterprise and Smith's participation to support the convictions in this case. Thus, Smith's agreement to join that enterprise remains sufficient to establish his culpability for the acts of the enterprise, including after 2015. *See Salinas*, 522 U.S. at 63–64 (1997); *United States v. Starrett,* 55 F.3d 1525, 1543–44 (7th Cir. 1995); *see also United States v. Lynch*, 699 F.2d 839, 842 n.2 (7th Cir. 1992) (Defendant contends "the government failed in its proof because, she argues, even if the evidence presented at trial was sufficient to show her knowledge and participation in the conspiracy after her husband's death—when she assumed a far more active role in operating the R.M. Lynch Company—the government failed to prove her knowledge and participation in the scheme before her husband died. This argument ignores the well-settled principle in conspiracy law that a conspirator is liable for all overt actions of other conspirators intended to advance the scheme.") (citation omitted) (citing *United States v. Read*, 658 F.2d 1225 (7th Cir. 1981)).

**e. Defendant Turman**

Turman argues that the Government failed to prove his participation in the Goonie Enterprise and that he conspired to commit two predicate acts. As described above, several witnesses identified Turman as part of Goonie Boss/Goonie Gang. Alex Vaughn identified Turman as a Goonie Boss member who "put in work" meaning Turman participated in gang activities, including violence, to make a name for himself in the gang. Tr. 510–12, 517–19. Alvin Vaughn, Raymond Parks, and Delbert Van Allen further identified Turman as a Goonie Boss/Goonie Gang member. Tr. 1269–70, 2053–54, 2519. Additionally, Turman himself confirmed his gang participation in the RICO enterprise via a video posted on Facebook. In his own words, "I love my whole Goonie Gang family," "I'm out here gang, gang, gang gang, gangbanging like crazy," and he further stated that he was against anyone who was against Goonie (i.e., rival gangs). Gov't Ex. 2323-1–2323-3. Beyond doubt, the Government's evidence showed that Turman was a Goonie associate who participated as a member of the RICO enterprise by taking part in shootings and other gang activities.

Despite the overwhelming evidence presented against him, Turman argues that, since the jury made a specific finding that Turman's racketeering activity was based on the murder of Kenneth Whittaker, but not the murder of Ramal Hicks, then Turman's RICO conviction could not be founded upon the required two racketeering predicate act objectives. This argument, however, ignores the requirements of the underlying RICO conspiracy charge itself that the jury found the Government proved beyond a reasonable doubt. As to Count One, the Government is not required to prove the actual commission of any predicate act or that any defendant personally agreed to commit any racketeering act or any overt act at all. *See Salinas*, 522 U.S. at 63–64 (1997) ("The RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove each conspirator agreed that he would be the one to commit two predicate acts."). Instead, to be guilty of a RICO conspiracy, the Defendant must merely "intend to further an endeavor which, if completed would satisfy all of the elements of a substantive criminal offense," and "it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65. Consequently, a conspirator may act "in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion"; it is enough that the conspiracy exists, "for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Id.* (citing *Callanan v. United States*, 364 U.S. 587, 594 (1961)).

In other words, even if Turman did not himself commit murder, attempt to murder, or agree to commit or assist in any specific murder or attempted murder, the jury's verdict on Count One still confirmed that the Government proved beyond a reasonable doubt what was required by law. Namely, the evidence proved that

Turman agreed to participate in the RICO conspiracy in which the objectives included that the Goonie Enterprise would engage in a pattern of racketeering activity with at least two predicate acts would be committed by some member of the conspiracy (i.e., at least two acts of murder or attempted murder under 18 U.S.C. § 1962(c)).[12]

Because the evidence was sufficient for a reasonable jury to convict on the RICO charge in Count One, the Defendants' Rule 29 motions must be denied as to this Count.

### 2. Constitutionality of RICO

Defendants argue that the Government has stretched RICO "too far" by applying the statute to a "local organization" [565] at 7–8,[13] and thus, the RICO statute is somehow unconstitutionally vague, specifically the definition of "enterprise."

Defendants, however, offer no new precedent that the RICO statute is unconstitutional, and this worn-out challenge has been made, and repeatedly rejected, for many years now. *See, e.g.*, *United States v. Glecier*, 923 F.2d 496, 498 n.1 (7th Cir. 1991) ("As for Glecier's challenge to the constitutionality of the RICO statute, *United States v. Aleman*, and the flood of cases from other circuits have settled that issue to our satisfaction. We also join the First and Third Circuits in reaffirming that the RICO statute is not unconstitutional despite Justice Scalia's statement concerning the pattern requirement in his concurrence in *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 251 (1989) (Scalia, J., concurring) (*dictum*).") (citations omitted) (first citing *Aleman*, 609 F.2d 298, 305 (7th Cir. 1979), *cert. denied*, 445 U.S. 946 (1980); then citing *United States v. Tripp*, 782 F.2d 38, 42 (6th Cir. 1986), *cert. denied*, 475 U.S. 1128 (1986)); *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991). As such, this Court finds no cause to depart from clear,

---

[12] In addition to the other evidence of his membership, facilitation, and participation in the RICO enterprise, the trial evidence also explicitly showed that Turman knew about the violent predicate objectives of the Goonie Enterprise. For example, in an interview with Detective Barsch, Turman admitted that while he didn't know all the details, he knew about the murders committed by his co-conspirators and stated that he could find out more information for the police based upon his relationship with the other gang members. Gov't Ex. 2065-2.

[13] Beyond the requisite effect on interstate commerce, nothing in the statute's text, nor the relevant case law, limits the application of RICO to national, international or any other unique organizations. *See Boyle*, 556 U.S. at 948 ("While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.").

binding, and well-settled case law from both the Seventh Circuit and the Supreme Court.

Even if this law were not binding (it is), the Defendants' argument would fail on the merits. The textual definition of "enterprise" is clear in RICO. *Turkette*, 452 U.S. at 583 (holding that an enterprise-in-fact is "a group of persons associated together for a common purpose of engaging in a course of conduct"). While a statutory definition may be broad, as long as it provides "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" and does not authorize or encourage arbitrary and discriminatory enforcement, the statute survives a challenge for constitutional vagueness. *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Here, beyond the lack of legal authority, the Defendants also fail to develop any argument explaining how the RICO statute's definition of "enterprise" falls into either vagueness category. *See id.* ("A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.") (citing *Chicago v. Morales*, 527 U.S. 41, 56–57 (1999)). Here, Defendants fail to explain what category their theory falls under, or how it otherwise amounts to a constitutional violation under current case law; *see also*, *Braun v. Village of Palatine*, 56 F.4th 542, 553 (7th Cir. 2022) (waiver of undeveloped arguments).

Given the Government's overwhelming evidence supporting the existence of the Goonie Enterprise and the binding case law supporting the constitutionality of the RICO statute, the Court will not overturn the verdict as to Count One.

### 3. Court's Response to Jury Note 6

Next, Defendants argue that the Court's response to Jury Note 6, which asked for the definition of racketeering, was incorrect and the purported prejudice warrants a new trial. [565] at 13–14. Specifically, Defendants contend that the Court's response failed to consider the jury instructions "as a whole." *Id.* at 14.

The trial record, however, undermines the Defendants' theory. Jury Note 6 stated, "Please give us the definition of racketeering. Not as it is 'stated' in Instruction 39. Instruction 39 defines 'racketeering activity.'" Tr. 3378–79. Of course, before responding to Jury Note 6, the Court first conferred with the parties and asked for proposed responses (which contained errors or were otherwise improper), and then this Court made modifications to its own draft response, Tr. 3385, and gave a final response as follows:

> Follow along with me. The law does not provide a separate definition of the term racketeering beyond the elements of the statutes charged in this case. The word racketeering is an adjective the law uses to identify

> two federal criminal statutes that have been charged as offenses in this case. The first offense is called racketeering conspiracy, which is charged in Count One, and its required elements are set forth in Court's Instruction 30. The second offense is called violence in aid of racketeering, which is charged in Counts Two, Three, Four, Five, Six, Seven, Nine, Ten, and Eleven, and its required elements are set forth in Court's Instructions 48, 49, 50, 51, 52, and 59. The government must prove the elements of each charge beyond a reasonable doubt as to each defendant charged. The elements of these two types of racketeering statutes, however, are not the same, even if the evidence in the case may apply to both types of offenses, so please consider each count and each defendant separately. Please rely on all of the Court's instructions on the law, and your individual and collective recollection of the evidence as you continue to deliberate your verdicts. Tr. 3389–90.

This final response was proper under the law and the facts of this case.

This final response (including the phrase "The word racketeering is an adjective")[14] remained correct, because, among other things, the answer reminded the jury that the Government "must prove the elements of each charge beyond a reasonable doubt as to each defendant charged." *See* Tr. 3390. Likewise, this Court's answer also reminded the jury to "rely on all of the Court's instructions on the law." Tr. 3390. Finally, the Court's final response explicitly acknowledged that the statutes differ, and "racketeering" may be used in different ways (". . . the elements of these two types of racketeering statutes, however, are not the same" and the jury must "consider each count and each defendant separately."). Thus, this Court's response properly incorporated the Court's entire set of instructions on the law and reminded the jury that those instructions must be read as a whole.

Accordingly, Defendant's fail to show any error or prejudice exists regarding the Court's response to Jury Note 6.

### C. Murder and Attempted Murder Verdicts

Defendants next challenge the sufficiency of evidence on several verdicts involving murder and attempted murder. Among other things, to sustain a conviction

[14] Contrary to Defendants' claim, neither the final answer, nor the full set of instructions, ever stated that "racketeering" is exclusively used as an adjective. Tr. 3389. Indeed, in discussing the Court's response, Defendants conceded that instructing the jury that the word "racketeering is an adjective" was a correct statement of law; and this defense concession occurred after the Court had removed, without objection, the modifier "simply" from a prior proposed answer that racketeering was "simply an adjective." Tr. at 3381–82.

of first-degree murder under Illinois law,[15] the Government must prove beyond a reasonable doubt that: (1) the defendant, or one for whose conduct the defendant is legally responsible, performed the acts which caused the death of the victim; and (2) the defendant intended to kill or do great bodily harm to that victim or another; or knows that such acts would cause death to that victim or another; or knows that such acts created a strong probability of death or great bodily harm to that individual or another. [531] at 46; 720 Ill. Comp. Stat. 5/9-1 (2024). For attempted first degree murder under Illinois law, the Government must show that the defendant committed any act which constitutes a substantial step toward the killing of an individual with the intent to kill an individual. The killing attempted need not have been accomplished. [531] at 39; 720 Ill. Comp. Stat. 5/8-4 (2024).

Consistent with *Apprendi*, for a defendant convicted of a RICO conspiracy to be eligible for a mandatory life sentence under 18 U.S.C. § 1963(a), the Government must prove beyond a reasonable doubt that a member of the conspiracy committed a predicate crime punishable by life, even if the defendant did not himself commit the act. *See United States v. Perez*, 21 F.4th 490, 493–94 (7th Cir. 2021); *United States v. Brown*, 973 F.3d 667, 708–09 (7th Cir. 2020). As relevant here, first-degree murder is punishable by life in Illinois if (among a list of other aggravating factors) the murder was committed when the defendant was at least 18 years old and was "cold, calculated, and premeditated" or was committed as a result of the intentional discharge of a firearm from a motor vehicle. 730 Ill. Comp. Stat. 5/5-8-1(a)(1)(b-5)(8), (11). Attempted first-degree murder is punishable up to a term of natural life imprisonment if the defendant personally discharged a firearm that proximately caused great bodily harm, disability, permanent disfigurement, or death. 730 Ill. Comp. Stat. 5/8-4(c)(1)(D). The jury, therefore, made supplemental findings in Phase Two determining whether certain aggravating factors applied to the murders for which it found defendants liable in its RICO conspiracy verdict.

By contrast, to subject the Defendants to a sentence of mandatory life imprisonment under the VICAR statute, 18 U.S.C. § 1959(a)(1), the jury must find beyond a reasonable doubt that the defendant himself knowingly and intentionally committed first-degree murder (as defined above) for the purpose of maintaining or increasing their position in an enterprise engaged in racketeering activity. *Cf. Delligati v. United States*, 504 U.S. 423, 427 (2025). If the jury made such findings in the first instance, no additional Phase Two findings are required to enable a mandatory life sentence. Here, Defendants' post-trial motions focus on the sufficiency of the evidence as to their VICAR convictions and make little reference to the jury's

---

[15] The RICO statute defines "racketeering activity" to include "murder … which is chargeable under State law and punishable by prison for more than one year." 18 U.S.C § 1961(a)(1). Likewise, 18 U.S.C. § 1959(a) criminalizes crimes of violence connected to racketeering activity that violate "the laws of any State or the United States." The Seventh Circuit has found it proper to look to Illinois' first-degree murder statute to help define the scope of a RICO predicate offense. *See United States v. Brown*, 973 F.3d 667, 708–09 (7th Cir. 2020).

Phase Two findings for the RICO conspiracy count (which therefore stand unchallenged). To the extent the Defendants were to be challenging the sufficiency of the evidence for those special findings, however, the record supports the jury's verdicts and the Court need not discuss the evidence separately here. That is, even though legal elements of the VICAR counts and the RICO conspiracy special findings remain distinct, the evidence coalesces factually and is sufficiently addressed by the Court's analysis of the evidence of the murder convictions below.

**1. Count Two: Stanley Bobo**

Smith challenges the sufficiency of the evidence as to his conviction?[16] involving the murder of Stanely Bobo. Smith cites testimony from Alex Vaughn, Brian Smith, Richard Alvarez, and Raven Owens related to the Bobo murder as evidence that the jury could have reasonable doubt about Smith's guilt. As discussed above, however, the standard to overturn a jury's verdict "whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *Garcia*, 919 F.3d at 497 (citing *Jackson*, 443 U.S. at 318–19). Here, the Government presented more than sufficient evidence regarding Smith's involvement in Bobo's murder to support the jury's findings.

Alex Vaughn testified that, on the day of the murder, the Goonies prepared to go shoot at rival gang members. Tr. 599–600. Vaughn joined Blackman, who was driving a stolen minivan. Tr. 600–01. Vaughn sat in the front passenger's seat while Defendant Smith and Kwonte Hughes, another Goonie member, sat in the back seat with guns. Tr. 599–601. Everyone in the car had gloves and was dressed in black clothing. Tr. 609. Vaughn told Raven Ownes, his girlfriend at the time, to trail the minivan in her car. Tr. 602–03. The group drove around opposition territory, looking for rival gang members to shoot and kill, until they saw an unfamiliar man, Bobo, getting bags out of a car. Tr. 603, 605. Blackman stopped the van and identified Bobo as an opposition gang member. Tr. 606. Hughes then slid open the rear van door and fired. Tr. 606–07. As Hughes closed the door, Defendant Smith also fired, though he hit Hughes. *Id.* The police appeared and followed the minivan, which sped up after the police pursuit. Tr. 607–08. The four men then jumped out of the vehicle and ran; and the police eventually detained Hughes. Tr. 607–08, 610.

Raven Owens, Alex Vaughn's girlfriend at the time of Bobo's murder, gave testimony that matched Vaughn's account. Ownes testified that Vaughn approached her in a minivan with Defendants Smith and Blackman, along with Hughes, and asked her to follow them. Tr. 1599. Defendant Blackman drove the minivan, Vaughn sat in the front passenger seat, and Defendant Smith and Hughes sat in the back.

[16] As noted above, Defendants Smith and Blackman failed to develop any specific challenge to the sufficiency of the evidence for the special findings as to the predicate murders under Count One, the RICO conspiracy. *See generally* [564] at 1–10; [565] at 6–15. Even if they did, however, this Court's analysis and conclusions would be the same given the overlapping, and overwhelming, evidence.

Tr. 1601. After following the minivan, Owens testified that the minivan stopped, the rear door slid open, she heard gunshots from the rear of the van, and she saw a man on the curb fall down. Tr. 1601–02. Owens watched the minivan drive away and a police car follow. Tr. 1602–03.

Nicole Turnage, Stanley Bobo's neighbor (who had no relationship to the Goonies), further testified that, on that day, she observed Bobo walk to his car. Tr. at 1552–54. Turnage then saw a minivan pull up, someone opening the rear door, and then she saw gun shots come from the van. Tr. 1554–55.

A different witness, Sgt. Alvarez, who was driving along with his partner, Lt. Anthony Escamilia, in an unmarked police car that day, also testified that he heard several gunshots and witnessed a maroon-colored minivan driving fast with its door open. Tr. 1849–50. Sgt. Alvarez pursued the minivan, saw three people jump out of the minivan, and followed one of the individuals. Tr. 1851–53. Later, Sgt. Alvarez inspected the minivan and noticed two guns and blood stains. Tr. 1854.

The Government also presented scientific evidence related to the firearms, bullets, the minivan, and Stanley Bobo's autopsy. The evidence showed gunshot residue in the minivan, Stipulation 24; Tr. 1642, that Stanley Bobo's cause of death was a gunshot wound, Stipulation 25; Tr. 1643, and that the fired bullets came from the guns used by Hughes and Defendant Smith. Tr. 1878.

The evidence described above sufficiently support the jury's findings as to the murder of Stanley Bobo. The Court denies Defendants' Rule 29 motions pertaining to Count Two.[17]

### 2. Count Three: Murder of Krystal Jackson; Counts Four through Six: Attempted Murder of Erin Ross, Thomas Turnage, and Melvin Burnett

Defendant Smith argues that the Government presented insufficient evidence as to Krystal Jackson's murder and the attempted murders of Erin Ross, Thomas Turnage, and Melvin Burnett. Defendant Smith specifically contends that the testimony of Timesha Simmons, Alex Vaughn, Erin Ross, and Thomas Turnage fails to adequately produce evidence to support the jury's findings. The Court disagrees; the Government presented sufficient evidence for the jury's verdicts, including Counts Three through Six, and to the extent Defendant Smith challenges the credibility of the witnesses' statements, that determination remains well within the jury's province. *See United States v. Watkins,* 107 F.4th 607, 626 (7th Cir. 2024) ("We

[17] While Smith's Rule 29 motion specifically addressed the sufficiency of the evidence of the murders of Stanley Bobo and Krystal Jackson, Defendant Blackman adopted his arguments in his own Rule 29 motion. *See* [565] at 20. The Court's analysis and conclusions as to those murders thus apply to Defendant Blackman as well as Smith.

respect the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences.") (quoting *United States v. Godinez,* 7 F.4th 628, 638–39 (7th Cir. 2021)).

One of the victims, Erin Ross, testified that on the night of Jackson's murder she was in Thomas Turnage's car with Krystal Jackson and another friend she did not know. Tr. 179-80. They stopped at the corner store on 69th and Loomis Street, went inside while Turnage stayed in the car, and then returned to the car. Tr. 180–81, 183. While Ross was scrolling on Instagram in the car, she heard gunshots and saw the shots come through the car from the driver's side. Tr. 183–84. Turnage, sitting in the driver's seat, was shot, and Jackson jumped into the back seat of the car from the passenger front seat. Tr. 184. Ross testified that she told Turnage to drive to the hospital, Jackson told Ross that she was shot, and then Jackson became unresponsive. Tr. 187–88. Thomas Turnage testified that he was a member of J-Town gang. Tr. 193. On November 19, 2024, Turnage testified that he drove to the Loomis store with Ross, Jackson, and his friend Melvin Burnett. Tr. 198–201. While they were sitting in the parking lot of Loomis, Turnage saw someone come up and shoot at the car from the driver's side. Tr. 203–04. Turnage drove to the hospital and realized he was shot in the head and shoulder. Tr. 204.

Timesha Simmons, Defendant Blackman's then girlfriend, testified that the night of Jackson's murder, Defendant Blackman drove Simmons and Defendant Smith to a corner store in Simmons' mother's white SUV. Tr. 130, 136–37. Defendant Blackman drove past the Loomis Food Mart and pulled over; Defendant Smith then left the vehicle. Tr. 138, 140–41. Simmons and Defendant Blackman stayed in the car, and Simmons heard the sound of gunshots or fireworks. Tr. 141. Shortly after, when Defendant Smith jumped back into the white SUV, his hood was up and he was breathing hard. Tr. at 142.

Alvin and Alex Vaughn further testified that Defendant Smith admitted to the murder, and they described specific details corroborated by Simmons' testimony and security video footage. Tr. 529–532, 1311. Alvin Vaughn additionally testified that he gave Defendants Blackman and Smith a gun that day for the Jackson murder and Smith ran to his house after the murder to pour bleach on his hands to remove any gunshot residue from the shooting. Tr. 1309–10.

Finally, the Government also presented video footage of the murder which showed the white SUV, Simmons' mother's vehicle, drive past the Loomis Food mart where Thomas Turnage's vehicle was parked in the parking lot. In the video, Defendant Smith appears wearing a hoodie that Simmons identified as the hoodie Smith wore the night of the murder. Defendant Smith fires several shots into Turnage's car and the video shows muzzle flashes coming from the firearm. Smith then runs away, turns, and fires more shots at the car while the car drives out of the parking lot. Gov't Ex. 1307-1, 1308-1.

Based on the evidence described above, the Government presented sufficient evidence to support the jury's findings, including Defendant Smith's conviction on Counts Three, Four, Five, and Six.[18]

**3. Count Ten: Andre Donner Murder**

Defendant Blackman claims that the Government presented insufficient evidence to support the jury's findings regarding the murder of Andre Donner. The record, however, undermines this challenge, because the Government presented sufficient evidence at trial to support the jury's findings, including the verdict of guilty on Count Ten and also to support the special finding in Count One that Andre Donner's murder was "Proven" with respect to Defendant Blackman.

The Government showed the jury a video of Donner's murder at trial. In the footage, Donner was standing on the corner 72nd and May when a silver SUV turned westbound onto 72nd Street from May. The same silver SUV returned about a minute later and stopped in front of Donner. Then, the front seat passenger exited the SUV, approached Donner, and visibly fired a gun in Donner's face as Donner fell to the ground. That individual then returned to the car which sped eastbound on 72nd Street toward Aberdeen. Gov't Ex. 1507-1.

Anna Lee, who called Defendant Blackman her best friend growing up, testified that she lived near 70th and Aberdeen at the time of Donner's murder. Tr. 917. Immediately after the murder, Defendant Blackman called her and told her to open her front door. Tr. 926. Lee did so and saw DeMarco Bennett's silver SUV parked in front of her house. Tr. 926–28. Lee stated that Defendant Blackman ran upstairs into the second floor of her house, and she observed that his eyes were "big." Tr. 927–28. The police arrived moments later and found a gun in the backyard of the neighboring house. Tr. 928, 930, 935.

Alex Vaughn also testified that Defendant Blackman told Vaughn that he and Bennet were driving around trying to find a rival gang member when they came across Donner standing on May. Tr. 621. Vaughn stated that Defendant Blackman told him that he left the car with a gun in his hand and started shooting Donner at close range. Tr. 622. Defendant Blackman then told Vaughn that, after he committed the murder, he drove to Anna Lee's house, and the police followed them there. Tr. 622.

Alvin Vaughn testified that Defendant Blackman told him the same story: Blackman said he killed Donner, went to Anna Lee's house while the police chased him, and threw the gun off the back porch. Tr. 1322–23.

---

[18] Since the jury found Defendant Smith not guilty of Counts Seven and Eight, the Court need not address Smith's arguments for sufficiency of evidence with respect to those Counts.

Chicago police officers Frankie Turner and Loretta Wiechart further corroborated the events of Donner's murder. Turner testified that he chased a silver SUV and saw Defendant Blackman run into Lee's house from the car. Tr. 950–53. Wiechart testified that she recovered a gun in the vacant lot next to Lee's home. Tr. 1003–04. Gregory Hickey, a forensic scientist, found that, based on his study of the evidence (including the bullets and gun), the gun recovered by Wiechart was the gun used in Donner's murder. Tr. 1140.

Given the evidence presented at trial, the Government clearly produced sufficient evidence to support the jury's findings.

#### 4. Murder of Kenneth Whittaker

Defendant Turman argues that the Government failed to present sufficient evidence to support the jury's findings regarding the murder of Kenneth Whittaker. In a jail conversation recorded by Alex Vaughn, Turman stated that the Goonies went out the night of Whittaker's murder to avenge the death of Robert Vaughn (G-Winnie). Tr. 660–61; Gov't Ex. 2066; 2066-T. Discussing what happened next, Turman said to Vaughn, "a mother fucker need to leave this earth," so the Goonies "drove everywhere" and "caught a motherfucker right there, uh, right there in front of Stagg. On Morgan by 75th." Gov't Ex. 2066-3; 2066-3-T at 2. The Government presented stipulations that Kenneth Whittaker was murdered on July 1, 2016, in front of Stagg Elementary. *See* Stipulation 33, Stipulation 34. Whittaker's cause of death was multiple gunshot wounds, including shots to the head. *See* Stipulation 34. Further, in an interview with Detective Henry Barsch, Defendant Turman described his participation in Kenneth Whittaker's murder, including being in the car with the shooter when Whittaker was killed in revenge for the murder of another Goonie member. Tr. at 2631–33, 2646–50, Gov't Ex. 2065-1 through 2065-06, 2065-T.

Given this evidence presented at trial, the Government clearly produced sufficient evidence to support the jury's finding that Kenneth Whittaker's murder was "proven" with respect to Defendant Turman.

#### 5. Murder of Alonzo Williams

Defendant Blackman challenges the sufficiency of the evidence related to the murder of Alonzo Williams, as charged in Count One. Specifically, Defendant Blackman contends that the Court erred in admitting Williams' statement, "Romeo shot me," as a dying declaration. The Government admitted this statement through the testimony of witness Janice Collier. Through Collier's testimony, the Government established that Collier heard four or five shots, went to her front door, and saw Alonzo Williams ("Zo") covered in blood staggering up the steps. Tr. 2594–95. Collier then saw Willams fall down the stairs. Tr. 2596. As Collier aided Williams by wiping

blood off his face, Williams, as he was dying, said "Romeo shot me," referring to Defendant Blackman. Tr. 2600. Defendant Blackman objected during trial, alleging insufficient foundation that Williams was dying or knew he was dying. Tr. 2598–99. The Court overruled that objection, and that evidentiary ruling remains correct. Tr. 2599.

Dying declarations are admissible under Fed. R. Evid. 804(b)(2) as "declarations made by a speaker who was both on the brink of death and aware that he was dying." *Giles v. California*, 554 U.S. 353, 358 (2008). As noted by the Court at trial, the facts established by the Government, specifically that "the witness suffered multiple gunshot wounds, was staggering, collapsed, and was dying on the steps," suffice to show both that Williams was dying and knew he was dying as required under Fed. R. Evid. 804(b)(2). Tr. 2599. Additionally, Williams clearly qualified as an unavailable witness given his passing as a result of the shooting. *See* Fed. R. Evid. 804(a)(4) (a declarant may be considered unavailable as a witness if the declarant is unavailable "because of death."). Therefore, the Court properly admitted Williams' statement as a dying declaration under Fed. R. Evid. 804(b)(2).

### C. Inconsistent Verdicts

Defendants Blackman and Smith both argue that the jury's verdicts were inconsistent and thus cannot stand. The jury found that Defendant Blackman was responsible for the first-degree murder of Andrew Donner, but in Phase Two the jury found that Blackman did not personally discharge a firearm for Donner's murder. Defendant Blackman claims that the Government only gave the jury the theory that Defendant Blackman was the shooter for the Donner murder, and since the jury found that the Government did not prove Blackman was the shooter, no other grounds for the Phase One findings exist. Likewise, the jury convicted Defendant Smith of first-degree murder for the murders of Stanley Bobo and Krystal Jackson, and the attempted murders of Erin Ross, Thomas Turnage, and Melvin Burnett. In Phase Two, the jury found "not proven" that Smith was the shooter for these incidents. Smith argues that these Phase One and Phase Two verdicts remain inconsistent and cannot stand.

Defendants' arguments must fail, however, because inconsistent verdicts do not form a basis for reversal of a conviction or the granting of a new trial. *United States v. Powell*, 469 U.S. 57, 65–66 (1984); *see also United States v. Genova*, 333 F.3d 750, 757 (7th Cir. 2003) ("Inconsistency does not spoil a conviction."). Generally, "once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment. Courts have always resisted inquiring into a jury's thought processes." *Powell*, 479 U.S. at 67 (citing *McDonald v. Pless*, 238 U.S. 264 (1915)). Sufficiency of evidence arguments, not inconsistent verdicts, protect criminal defendants "against jury irrationality or error" and "this review should not be confused with the problems caused by inconsistent verdicts." *Id.*

While Defendant Blackman cites to several Sixth Circuit cases which interpret *Powell's* general rule not to extend to cases where a special verdict finding negates an essential element of an offense, neither the Supreme Court nor the Seventh Circuit have recognized this approach. [565] at 15. Therefore, *Powell* remains binding on this Court.

Nevertheless, even if the Seventh Circuit adopted this Sixth Circuit exception, the result would be the same in this case because the jury's verdicts were not necessarily inconsistent. Personal discharge of a firearm is not an element of first-degree murder under Illinois law. *People v. Alexander*, 2017 IL App (1st) 142170, ¶¶ 47, 415. Additionally, the Court instructed the jury that "a person commits the offense of first-degree murder when he *or one for whose conduct he is legally responsible*" killed the victim. Tr. 3033; [531] at 40, 45 (emphasis added). As instructed by the Court, a defendant "is legally responsible for the conduct of another person, when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of the offense, he knowingly solicits, aids, abets, agreed to aid, or attempts to aid the other person in the planning or commission of the offense." Tr. 3033; [531] at 41; *People v. Coleman*, 229 N.E.3d 306, 316 (Ill. App. Ct. 2023); *People v. Ayers*, 771 N.E.2d 1041, 1050 (Ill. App. Ct. 2002). Thus, without any inconsistency, the jury could properly find that the Government proved beyond a reasonable doubt that Defendants Blackman and Smith themselves or someone they were legally responsible for killed the victim, and separately find, without legally undermining their finding regarding criminal liability, that the Government failed to prove beyond a reasonable doubt that Blackman and Smith themselves were the shooter.

Accordingly, no basis exists for the Court to grant Defendants' arguments regarding inconsistent verdicts.

## III. New Trial

Defendants separately request a new trial under Rule 33. This Court may vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). District courts should grant a new trial "if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436, 438 (7th Cir. 2006) (affirming district court's grant of new trial). The trial court maintains broad discretion in making this determination because it "heard all the evidence, watched both the witnesses and the jury," and is in the best position to determine whether any improper evidence "tipped the scale against" a defendant. *Id.* at 438. Additionally, if the Court "believes there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted — [it] has the power to set the verdict aside, even if he does not think that he made any erroneous rulings at the trial." *United States*

*v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990) (citation omitted). To be sure, a jury verdict in a criminal case "is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quotation marks and citation omitted). Therefore, this rule is "reserved for only the most extreme cases," *United States v. Hagler*, 700 F.3d 1091, 1101 (7th Cir. 2012) (citation omitted), and a trial court should grant a motion for a new trial "only if the evidence 'preponderates heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.'" *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007).

### A. Pretrial Motions

#### 1. Motion for Severance

Defendant Smith renewed his motion for severance, which the Court first denied on December 8, 2022, [264], at the close of trial. As a basis for his motion, Smith points to the alleged inconsistent jury verdicts and the harm caused by having Blackman as a co-defendant. Defendants Blackman and Turman join in Smith's motion, but they do not develop any individualized arguments. To the extent either defendant had additional available arguments for severance, those arguments are waived. *Braun*, 56 F.4th at 553.

When, as here, multiple counts or claims against multiple defendants are properly joined under Federal Rule of Criminal Procedure 8(b), the trial court maintains discretion under Rule 14 to address the potential for any prejudice that may result.[19] Fed. R. Crim. P. 8(b) (If the joinder of offenses or defendants in an indictment "appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."); *see also United States v. Garner*, 837 F.2d 1404, 1412 (7th Cir. 1987) ("Once the Rule 8 requirements are met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14."); *United States v. Diaz*, 876 F.2d 1344, 1357 (7th Cir. 1989) (same).

The trial court's discretion under Rule 14 remains broad. As the Seventh Circuit held in *United States v. Rollins*, Rule 14 leaves the "determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." 301 F.3d 511, 517–18 (7th Cir. 2002) (internal citations and quotations omitted). In fact, "Rule 14 does not require severance even if prejudice is shown; rather it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538–39 (1993). The Supreme Court further instructed in *Zafiro* that a district court should grant a severance under Rule 14 "only if there is a serious risk" that a joint trial would "compromise a specific

[19] Here, the parties do not dispute proper joinder under Rule 8(b) and instead dispute only the issue of severance under Rule 14.

trial right of one of the defendants" or would "prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539.

The Seventh Circuit has outlined several circumstances where sufficient prejudice might lead to a severance: "(1) conflicting and irreconcilable defenses; (2) a massive and complex amount of evidence that makes it almost impossible for the jury to separate evidence as to each defendant; (3) a codefendant's statement that incriminates the defendant; and (4) a gross disparity of evidence between the defendants." *United States v. Clark*, 989 F.2d 1490, 1499 (7th Cir. 1993).

Defendant Smith points to the fourth circumstance—a gross disparity of evidence—to support the need for severance here. According to Defendant Smith, the Government's evidence against the other defendants, specifically Facebook posts attributed to Defendants Blackman, McElroy, and Turman, was highly prejudicial and would not have been admitted in a separate trial against him alone. [564] at 17–18.

While "spillover evidence" may apply as a concept in certain contexts, Defendants' reliance on it here is misplaced. In a prosecution under 18 U.S.C. § 1962, evidence of the means and methods employed by an association-in-fact enterprise is not "spillover" evidence—instead, it goes to the very heart and nature of the conspiracy in which each Defendant is charged with participating. *United States v. Delatorre*, 522 F. Supp. 2d 1034, 1046–47 (N.D. Ill. 2007) ("Because each individual defendant is a charged member of the RICO conspiracy case, 'the vast majority, if not all, of the evidence admitted in the joint trial would have been admissible had [the defendant] been tried alone.'"), *aff'd sub nom. United States v. Benabe*, 436 F. App'x 639 (7th Cir. 2011) (citing *United States v. Souffront*, 338 F.3d 809, 831 (7th Cir. 2003)). The fact that certain members of the conspiracy, and not others, committed particular acts in furtherance of the conspiracy does not detract from the relevance and admissibility of that evidence against each member, because it goes to the pattern and practice of the criminal enterprise. *See id.; United States v. Scarfo,* No. CRIM. 11-740 RBK, 2012 WL 4120504, at *11 (D.N.J. Sept. 19, 2012) ("Broad joinder authority is appropriate in the RICO context" because forcing the Government "to try some alleged criminal activities separately from others alleged to be part of the same RICO enterprise would prevent" the Government "from prosecuting the type of crimes the statute was intended to combat.") (quoting *United States v. Vastola,* 670 F. Supp. 1244, 1262 (D.N.J. 1987)), *aff'd*, 41 F.4th 136 (3d Cir. 2022), *judgment entered sub nom. United States v. Maxwell,* No. 15-2925, 2023 WL 11282245 (3d Cir. July 17, 2023). As the Seventh Circuit articulated in *United States v. O'Malley*, under RICO, it is "irrelevant that each defendant participated in the enterprise's affairs through different and unrelated crimes" and even though the defendants used different means, the indictment still alleges that "each participated in the same offense: furtherance of the enterprise." 796 F.2d 891, 895 (7th Cir. 1986) (internal citations omitted). Evidence of the enterprise, the enterprise's various predicate objectives,

and the various acts in furtherance, all remain admissible as direct evidence against all three defendants. Thus, the record undermines the defense's severance argument.

Smith also invokes "mutually antagonistic or irreconcilable defenses" as another grounds for severance since "Blackman essentially conceded guilt" based on Defendant Blackman's counsel's statement in closing argument, "Murder is bad, right. Shooting at people is bad. Attempting to kill people, also bad." Tr. 3197. Yet, these statements (taken out of context by Smith in his motion) did not present a theory of defense, let alone a "mutually antagonistic or irreconcilable" defense. Even if the remarks did so (they did not), Defendants acknowledge proper joinder under Rule 8(b) exists here, and the law does not mandate severance even if codefendants have conflicting defenses. *Zafiro*, 506 U.S. at 538–39. Rather, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. Since Defendant Smith fails to articulate any specific prejudice purportedly caused by the statements of Blackman's defense counsel, there exists no grounds for severance. *See United States v. Mietus*, 237 F.3d 866, 873 (7th Cir. 2001) ("Even a showing that two defendants have 'mutually antagonistic defenses,' that is, that the jury's acceptance of one defense precludes any possibility of acquittal for the other defendant, is not sufficient grounds to require a severance unless the defendant also shows prejudice to some specific trial right.").

Defendants Smith (and by joining the motion, Turman and Blackman) fail to demonstrate that the evidence against them in the joint trial prejudiced any such right or impaired the jury's decision-making. Indeed, numerous federal courts across the nation have conducted similar RICO trials before juries without compromising the fairness or integrity of the proceedings. *See Delatorre,* 522 F. Supp. 2d at 1046–47. Based upon the record, the Court properly denied Defendant Smith's motion to sever.

**B. Other Errors**

Defendants Smith and Turman list several other purported errors in their briefings including jury instructions, pretrial motions, oral motions and objections, among others. [564] at 15–16; [566] at 10–11. Defendant Blackman adopts the relevant motions by his co-defendants that may apply to his counts of conviction. [565] at 20.

The Defendants, however, only generally list the alleged errors and fail to explain why the errors entitle any Defendant to a new trial. It is well established that a defendant's failure to develop an argument waives the issue. *Braun v. Village of Palatine*, 56 F.4th 542, 553 (7th Cir. 2022) ("A litigant 'waives an argument by failing to make it before the district court.' This rule applies when 'a party fails to

develop arguments related to a discrete issue' . . . .") (first citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011); and then citing *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) (finding waiver because the party "did not present legal arguments or cite relevant authority to substantiate claim")) (citations omitted); *see also United States v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (quoting *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986)). In this case, Defendants' broad generalizations regarding objections and motions remain insufficient to allow the Court to consider the merits of any alleged error. *Gross v. Town of Cicero.*, 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in the record.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

To the extent the Defendants challenge the Court's pre-trial and trial rulings without developing any argument why the alleged error requires a new trial under Rule 33, the issues are waived, the record stands as correct, and the Court finds no basis to order a new trial.

## IV. Second Motion for New Trial and Request for Evidentiary Hearing [647]

On 7/10/2025, Defendant Blackman filed a second motion for new trial pursuant to Rule 33(b)(1) and a request for an evidentiary hearing. [647]. Defendant Smith adopted Blackman's motion, [650], and the Government and Blackman briefed the motion, [654], [658]. After holding a hearing, this Court denied Defendants' motion, [647], [650].

Blackman based his motion upon a conversation between his defense counsel and Alex Vaughn.[20] According to counsel, Alex Vaughn stated that he did not testify truthfully about: (1) an incident following his cooperation with law enforcement where Vaughn was caught in possession of a gun in Indiana; and (2) the role of "Midge and Old Man" in the murders at issue in trial. [647] at 3–4. Blackman argues that Alex Vaughn's statements "constitute 'newly discovered' evidence" that requires the Court to grant a new trial pursuant to Rule 33, or at least requires an evidentiary hearing to further explore Vaughn's statements.[21] *Id.* at 4–5. The Government opposed both requests. [654].

To receive a new trial based upon Defendant's claim that Alex Vaughn committed perjury during his trial testimony, where there exists no allegation that

[20] This conversation occurred over the telephone with handwritten notes being taken by defense counsel. [647] at 3.

[21] Alex Vaughn later refused to talk with defense counsel following the initial unsworn conversation over the telephone. [647] at 4.

the Government knowingly presented false testimony, Defendants must show that "the perjured testimony: (1) came to their knowledge only after trial; (2) could not have been discovered sooner with due diligence; (3) was material; and (4) would probably have led to an acquittal had it not been heard by the jury." *United States v. Womack*, 496 F.3d 791, 796 (7th Cir. 2007). In this case, Defendants fail to make such a showing.

Where "the facts alleged in support of a motion for a new trial were within the defendant's knowledge at the time of trial," the evidence fails to satisfy the first requirement. *United States v. Theodosopoulos*, 48 F.3d 1438, 1448 (7th Cir. 1995) (quoting *United States v. Ellison*, 557 F.2d 128, 133 (7th Cir. 1977)).

Here, Alex Vaughn testified at trial regarding the incident with law enforcement in Indiana and the role of Midge and Old Man in the events charged in the indictment, and he faced rigorous cross examination from defense counsel on these same topics. *See, e.g.*, [539] Tr. 728:2–729:6 (cross examination of Alex Vaughn discussing his fear with Old Man and taking directions from him); Tr. 748:23–25 (discussing Vaughn receiving gun from Midge); Tr. 784:13–16 (discussing incident with law enforcement where officers "found two handguns in the door pocket right next to" Vaughn). Because Alex Vaughn was a key Government witness "and his testimony was subject to exhaustive cross-examination" on the exact topics that Defendant claims Alex Vaughn perjured himself, Defendant cannot claim that "the existence of the perjurious testimony came to" his "knowledge only *after* trial." *United States v. Ogle*, 425 F.3d 471, 477–78 (7th Cir. 2005) (citing *Mitrione*, 357 F.3d at 718); *see also id.* ("The tools of the adversary process supply the means to expose many testimonial short comings such as a witness who may be lying.") (citing *Buie v. McAdory*, 341 F.3d 623, 625 (7th Cir. 2003)) (cleaned up)).

Consequently, Defendants cannot prove the first requirement of the *Mitrione* test, and they fail to prove any basis to order a new trial based upon Alex Vaughn's allegedly perjured testimony. *See id.* at 478 (upholding denial of motion for new trial where Defendant could not prove that existence of the perjurious testimony came to defendant's knowledge after trial; noting that "the evidence in question all pertained to matters" that Defendant "knew would be in issue at trial, even if he did not know the government's exact position on these matters") (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005)). In sum, the issue raised concerning Alex Vaughn's testimony does not warrant a new trial under the applicable standards.

Moreover, even though Defendant Blackman's second motion for new trial [647] (which was adopted by codefendant via this Court's prior order [675]) did not mandate an evidentiary hearing, this Court, in an abundance of caution, held one

anyway, and then denied the motions.[22] As noted in open court on April 30, 2026, this Court reviewed the entire record and made various findings of fact that undermined the defendants' theory. [693]. First, Special Agent Thomas Callaghan testified credibly (including providing details about Defendant Blackman's attempts to cooperate and the recovery of recorded jail calls), and the exhibits admitted at the April 30 hearing were material and compelling. Likewise, this Court further found that the admitted recorded jail calls (while not capturing every communication between Blackman and Alex Vaughn) did, in fact, include Blackman's own words, and this evidence was clear and fatal to the motions. Indeed, this Court found that Defendant Blackman engaged in a two-fold scheme to both attempt to cooperate with the Government post-trial for a possible reduced sentence, and to willfully engage in obstruction of justice and the subordination of perjury to undo the trial, with both of these objectives designed to escape the long prison term he faced after return of the jury's guilty verdicts. Lastly, this Court also found that the informant Alex Vaughn testified truthfully at trial (which again proves fatal to the motions) and that the informant's allegiance to Blackman simply increased post-trial and this more recent motive to falsely "recant" remains confirmed by the evidence.[23] Nevertheless, as to the material portions of Alex Vaugh's sworn testimony on January 27, the informant did credibly reconfirm the truth of his trial testimony; and Alex Vaughn also truthfully described how Blackman asked him to lie post-trial, and he clarified the fact that no one needed to "direct" Blackman to do any murders during the 2014-2016 time frame when Blackman was, in fact, the gang leader.[24]

Thus, in addition to being legally defective on its face, Defendants second motion for a new trial fails as a matter of fact because, among other things, Alex Vaughn's trial testimony was not false.

---

[22] This Court's findings of fact arise from the evidence admitted at trial, as well as the evidence produced at the hearing held on January 27, 2006, which included the sworn testimony of Alex Vaughn and Special Agent Thomas Callaghan, Government Exhibits A, B and C, Defense Exhibits 1 and 2, and the parties' Stipulation One.

[23] In this regard, this Court found that the informant's other post-trial statements had mixed credibility; for example, the Court found incredible the portions of his unsworn statements to defense counsel about purportedly giving false trial testimony or "somewhat truthful testimony" (indeed, this was part of the scheme to willfully obstruct the proceedings with false testimony).

[24] On January 27, Alex Vaughn also clarified other points, albeit with some obvious confusion; for example, he was honestly confused about who first came up with the post-trial attempts to try again to cooperate with the Government. This issue, however, was not material.

**V. Conclusion**

For the reasons stated above, the Court has denied Defendants' Motions for Acquittal or, in the alternative, Motion for New Trial as well as Defendant Blackman's second motion for a new trial.

Date: October 7, 2026

ENTERED:

John Robert Blakey
United States District Judge